Ellen N. Adler, Esq. (SBN #235534)
ENAdler@TheAdlerFirm.com
Omeed Latifi, Esq. (SBN #299750)
OLatifi@TheAdlerFirm.com
**ADLER LAW GROUP, APLC**
402 W. Broadway, Suite 400
San Diego, CA 92101
Telephone: (619) 531-8700
Fax: (619) 342-9600

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IRISH MURNANE, BY AND THROUGH THEIR GUARDIAN AD LITEM, LARRY MURNANE; MALAKAI MCDONALD, BY AND THROUGH THEIR GUARDIAN AD LITEM CRISTINA MCDONALD; AND RORY MCDONALD, BY AND THROUGH THEIR GUARDIAN AD LITEM CRISTINA MCDONALD,<br><br>Plaintiffs,<br>v.<br><br>VEOLIA WATER WEST OPERATING SERVICES, INC.; VEOLIA WATER NORTH AMERICA-WEST, LLC; MARK WIPPLER, an individual; JACOB SCHMIDT, an individual; RANDY FREUND, an individual; and DOES 1 through 200, inclusive,<br><br>Defendants. | Case No.: '26CV6210 JO JAC<br><br>**COMPLAINT FOR:**<br><br>**(1) Negligence**<br>**(2) Public Nuisance**<br>**(3) Private Nuisance**<br>**(4) Trespass**<br>**(5) Battery**<br>**(6) Negligence Per Se — Health & Safety Code §§ 5411 and 5411.5**<br><br>**REQUEST FOR JURY TRIAL** |

Plaintiffs IRISH MURNANE, BY AND THROUGH THEIR GUARDIAN AD LITEM, LARRY MURNANE; MALAKAI MCDONALD, BY AND THROUGH THEIR GUARDIAN AD LITEM CRISTINA MCDONALD; AND RORY MCDONALD, BY AND THROUGH THEIR GUARDIAN AD LITEM CRISTINA MCDONALD, ("Plaintiffs") by and through their undersigned counsel, hereby file the following complaint for damages and injuries ("Complaint") against all Defendants and DOES 1-200.

**INTRODUCTION**

1. This lawsuit is brought by residents of the cities of Imperial Beach and Coronado (collectively, the **"South Bay"**) against Veolia Water West Operating Services, Inc., Veolia Water North America-West, LLC (collectively, "Veolia"), and several Veolia employees who worked or work at the South Bay International Wastewater Treatment Plant ("SBIWTP" or the "Facility"), including Mark Wippler ("Wippler"), Jacob Schmidt ("Schmidt"), and Randy Freund ("Freund") (collectively, "Defendants"). Despite being tasked with preventing South Bay residents from being exposed to raw sewage and other contaminants, Defendants have failed to do their job. These failures have not only impacted Plaintiffs' health but have created an ecological disaster directly impacting public safety, all while denying community members the right to live and recreate in a safe and clean environment.

2. This Complaint is filed in federal court and pleaded to satisfy the standards of Fed. R. Civ. P. 8(a) as construed by *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). The factual

allegations herein are intended to state claims that are plausible on their face. Plaintiffs identify specific acts and omissions by each Defendant, specific dates and volumes of discharge events, specific contractual provisions breached, and specific regulatory orders violated. Where allegations are pleaded on information and belief, they are based upon the public record of regulatory proceedings, Water Board orders and notices of violation, the Defendants' own National Pollutant Discharge Elimination System ("NPDES") permit compliance filings, and published governmental and news reports, each referenced herein as applicable.

3. The SBIWTP, located near the U.S.-Mexico border in San Diego, is the facility responsible for intercepting and treating sewage flowing northward from Tijuana. Defendant Veolia is the private contractor paid to operate the SBIWTP and Defendant Wippler was its plant manager. As explained below, Defendants, through their intentional acts, negligence, recklessness, and other misconduct, have caused Plaintiffs to suffer harm from contact with untreated sewage and other contaminants. These contaminants include pollutants such as fecal bacteria, contaminated sediment, heavy metals, DDT, Benzidine, and Polychlorinated Biphenyls ("PCBs"), all of which are discharged into the Tijuana River and Estuary, and eventually, the Pacific Ocean in violation of the

express terms and conditions of their NPDES Permit and the Clean Water Act, Title 33 U.S.C. Section 1342.[1]

4. The NPDES Permit requires Veolia to capture certain wastewater flows from Mexico, divert the flows to the SBIWTP, and then discharge up to 25 million gallons per day ("MGD") into the Pacific Ocean via the Facility's South Bay Ocean Outfall ("SBOO").[2] But because of decades of neglect, deferred maintenance, and other misconduct, the Defendants have violated the NPDES Permit on at least 1,430 documented occasions since 2018,[3] resulting in at least 15 Notices of Violation from the San Diego Regional Water Quality

---

[1] NPDES Order No. R9-2021-0001, as amended by Order No. R9-2023-0009 and Order No. R9-2026-0005, Permit No. CA0108928, Waste Discharge Requirements for the U.S. Section of the Int'l Boundary & Water Comm'n, S. Bay Int'l Wastewater Treatment Plant, Attachment F (Fact Sheet), Tbls. F-3, F-5 & F-8 (Cal. Reg'l Water Quality Control Bd., San Diego Region), https://www.waterboards.ca.gov/sandiego/water_issues/programs/iwtp/ (establishing effluent limitations and confirming effluent monitoring for fecal coliform, Benzidine, DDT, Polychlorinated Biphenyls (PCBs), and heavy metals including lead, mercury, arsenic, and copper at Monitoring Location EFF-001 (South Bay Ocean Outfall)); David Gibson, Exec. Officer, Cal. Reg'l Water Quality Control Bd., San Diego Region, Executive Officer's Report (Feb. 12, 2025) [hereinafter Feb. 2025 EOR], https://www.waterboards.ca.gov/sandiego/publications_forms/publications/docs/executive_officer_reports/2025/eor_02_12_2025.pdf , at 9 (confirming 15 notices of violation issued to USIBWC for "effluent exceedances, late report submissions, inadequate maintenance, and unauthorized discharges of waste").

[2] NPDES Order No. R9-2021-0001, as amended by Order No. R9-2023-0009, Permit No. CA0108928, Waste Discharge Requirements for the U.S. Section of the Int'l Boundary & Water Comm'n, S. Bay Int'l Wastewater Treatment Plant, tbl. 1 (discharge to Pacific Ocean via SBOO at Discharge Point No. 001), § 6.3.2.1.1.2 (defining Canyon Collector Transboundary Flow Event as failure to capture flows "for treatment at the SBIWTP and disposal through the SBOO"), Attachment F (Fact Sheet) § 2.1 & tbl. F-2 (pp. F-7 to F-8) ("The canyon collector systems are designed to capture and convey dry weather transboundary flows to the SBIWTP for treatment and disposal through the SBOO"), & Attachment F § 4.2.2.3 (p. F-23) (25 MGD secondary treatment design capacity; average monthly flow limit) (Cal. Reg'l Water Quality Control Bd., San Diego Region, May 12, 2021), https://www.waterboards.ca.gov/sandiego/water_issues/programs/iwtp/; Feb. 2025 EOR, *supra* note 1, at 7 (confirming that a CWA permit authorizes USIBWC to discharge treated effluent through an outfall 3.5 miles offshore and that USIBWC is the sole discharger).

[3] *San Diego Coastkeeper v. USIBWC*, Compl. at ¶ 140, C/A No. 3:24-cv-00663-JES-VET, S.D. Cal., filed April 11, 2024.

Control Board and leading to escalating enforcement orders causing harm to the Plaintiffs.[4]

5. The problems caused by the Defendants' actions and inactions are vast. Notably, a September 29, 2023 report from the California Coastal Commission explained that over the past five years, more than 100 billion gallons of transboundary flows containing untreated sewage, bacteria, viruses, heavy metals, pesticides, sediment, trash, and toxic chemicals, flowed from Mexico into Southern California via the Tijuana watershed.[5] Much of that contamination flowed through the Tijuana watershed untreated as a direct result of Defendants' actions and inactions. The contaminants also flow back into the Tijuana River and Estuary via leaks, spills, and bypass events from the canyon collectors and other Facility infrastructure that Veolia failed to properly maintain, all in violation of the NPDES Permit.[6]

---

[4] San Diego Reg'l Water Quality Control Bd., Exec. Officer Rpt. 2 (Feb. 12, 2025), at p. 9 (avail. at https://www.waterboards.ca.gov/sandiego/publications_forms/publications/docs/executive_officer_reports/2025/eor_02_12_2025.pdf. (last visited May 28, 2026)); San Diego Reg'l Water Quality Control Bd., *South Bay International Wastewater Treatment Plant,* https://www.waterboards.ca.gov/sandiego/water_issues/programs/iwtp/index.html (last updated May 30, 2025).

[5] Cal. Coastal Comm'n, Staff Rpt: Informational Briefing on the Trans-Boundary Pollution Crisis in the Tijuana River and Tijuana River Valley, at 1 (Sept. 29, 2023) (presented to the Comm'n at its Oct. 11, 2023 meeting in Imperial Beach), https://documents.coastal.ca.gov/reports/2023/10/W6b/W6b-10-2023-appendix.pdf (reporting that over 100 billion gallons of transboundary flows containing untreated sewage, bacteria, viruses, heavy metals, pesticides, sediment, trash, and toxic chemicals flowed from Mexico into Southern California via the Tijuana watershed over the preceding five years).

[6] Feb. 2025 EOR, *supra* note 1, at 11 ("[D]ry weather flows enter into the Tijuana River Valley when they bypass USIBWC's canyon collectors, resulting in a variety of impacts. This includes, but is not limited to, impacts to wildlife/habitats, public health, and access (e.g., recreation, flood control maintenance).").

6. Defendants' failure to comply with the NPDES Permit has resulted in serious consequences to human health and the environment. South Bay residents routinely complain of breathing issues, headaches, rashes, and gastrointestinal illness as a result of exposure to dangerous and deadly pathogens, raw sewage, hazardous toxins, and noxious odors.[7] These issues impact Plaintiffs' health and in turn interfere with both their use and enjoyment of their property as well as the beaches and parks in South Bay communities.




*Photo taken from news report by CBS 8 News, Chris Gros*

7. In particular, according to an August 18, 2025 article, "swaths of the south San Diego County coast have been closed every day—1,345 days in a

[7] Feb. 2025 EOR, *supra* note 1, at 12 ("[E]lected officials, stakeholder agencies, non-governmental organizations, community groups, and residents continue to express concern over public health impacts from the continuous presence of water and air pollution"; describing three government-sponsored health surveys: the CDC/County of San Diego Community Assessment for Public Health Emergency Response (Oct. 2024); the County of San Diego/ATSDR online exposure survey (Oct.-Nov. 2024); and the SDSU 'Healthy Water, Healthy Air' community survey (Oct. 2024-present)).

row and counting—because of sewage and industrial pollution flowing in from the Tijuana River."[8] This includes, among other places, closures at Imperial Beach, Silver Strand State Beach, and Border Field State Beach.[9] As a result of these closures, many recreation and outdoor activities have become impossible for Plaintiffs. Additionally, residents in these communities have received "boil water" orders due to contaminated drinking water.[10]

8. Wildlife in the area has also suffered: a recent report by San Diego State University's School of Public Health linked the sepsis deaths of Bottlenose dolphins to the discharge of sewage into the ocean at Imperial Beach.[11]

9. Recent studies also found aerosolized sewage pollutants are present in the air in the South Bay at levels presenting a likely public health threat.[12]

---

[8] Magana, Marcos, Pollution isn't the only obstacle keeping kids from beaches in San Diego (L.A. Times, Aug. 18, 2025) (avail. at https://www.latimes.com/environment/story/2025-08-18/youth-cleaning-tijuana-river (last visited May 19, 2026)).

[9] Feb. 2025 EOR, *supra* note 1, at 12 ("[T]he beaches from Border Field State Park to Imperial Beach are also closed due to the risk from pathogens in the sewage in the transboundary flows. With a few recent exceptions when PBCILA began diverting Tijuana River flows, these beaches have been closed continuously since December 8, 2021.").

[10] *See* Laurie Isola, *Clean Water Woes Mount for San Diego's South Bay*, KPBS (Aug. 29, 2023), https://www.kpbs.org/news/environment/2023/08/25/clean-water-woes-mount-for-san-diegos-south-bay (reporting three-day boil water advisory issued August 25, 2023 for more than 106,000 residents in Imperial Beach and surrounding communities due to E. coli detection in the drinking water supply); *see also* MacKenzie Elmer, *South Bay School Districts Want Action on Tijuana River Crisis*, inewsource (Mar. 19, 2024), https://inewsource.org/2024/03/19/south-bay-school-districts-call-to-action-tijuana-river (noting that "contamination was so severe that it prompted a boil water advisory for three days in parts of Imperial Beach because of the presence of E. coli . . . found in the drinking water").

[11] Paula E. Stigler Granados et al., Tijuana River Contamination from Urban Runoff and Sewage: A Public Health Crisis at the Border (San Diego State Univ. Sch. of Pub. Health, Feb. 13, 2024), https://www.sdsu.edu/_files/tijuana-sewage-contamination-public-health-crisis-white-paper-021424.pdf [hereinafter SDSU White Paper].

[12] Paula E. Stigler Granados et al., Tijuana River Contamination from Urban Runoff and Sewage: A Public Health Crisis at the Border (San Diego State Univ. Sch. of Pub. Health, Feb. 13, 2024),

And because of the aerosolized sewage pollutants caused by Defendants' actions and inactions, many people have suffered from gastrointestinal issues both from going into the water and from simply breathing the air.[13]




*Article by Stacy Liberatore for DailyMail.com*

10. In other words, along with the deadly effects on wildlife, people living near or in the vicinity of the Tijuana River, Tijuana River Estuary, and the SBIWTP are routinely exposed to aerosolized bacterial pathogens from raw sewage attributed to discharges, even if they do not go into the water. These discharges, contaminated

https://www.sdsu.edu/_files/tijuana-sewage-contamination-public-health-crisis-white-paper-021424.pdf; *see also* Feb. 2025 EOR, *supra* note 1, at 12 (citing the SDSU "Healthy Water, Healthy Air" community survey documenting health issues from water and air pollution in the Tijuana River region).

with pathogens, chemicals, sediment, and trash, continue to severely degrade the Tijuana River Estuary and offshore marine habitat, all of which harms local businesses, tourism, and Plaintiffs.

## JURISDICTION AND VENUE

11. By Order of this Court, subject matter jurisdiction exists over this matter because Defendants allege that they can assert colorable federal defenses.

12. As a result, venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims alleged herein, including Plaintiffs' injuries, occurred within this District. Pursuant to S.D. Cal. Civil Local Rule 40.1, this case should be assigned to the San Diego division.

## PARTIES

13. Plaintiffs are business owners, owners and/or residents of properties located in the cities of Imperial Beach and Coronado, California, and have suffered harm from exposure to the contaminated water, air, and soil described herein.

14. The damages suffered by Plaintiffs include damage to real property, damage to structures, damage to personal property and cherished possessions,

[13] SDSU White Paper, *supra* note 11, at 12–14; *see also* Bernardo Rico et al., Heavily Polluted Tijuana River Drives Regional Air Quality Crisis, ChemRxiv (preprint 2024), https://chemrxiv.org/engage/chemrxiv/article-details/67525c1b5a82cea2fa2227b7

loss of business income, personal injuries, illness, discomfort, annoyance, inconvenience, mental anguish, loss of quiet enjoyment, and emotional distress.

15. Defendant VEOLIA WATER WEST OPERATING SERVICES, INC. ("Veolia West") is a Delaware corporation authorized to do business in California. Veolia West operates and maintains offices in multiple locations, including San Diego, California.

16. Defendant VEOLIA WATER NORTH AMERICA-WEST, LLC ("Veolia North America") is a Delaware limited liability company authorized to do business in California. Plaintiffs refer to Veolia West and Veolia North America collectively as "Veolia" unless otherwise specified.

17. Defendant MARK WIPPLER ("Wippler") was an employee of Veolia who resided in San Diego, California. At all times relevant to the facts and circumstances alleged in this pleading, Wippler was Project Manager at Veolia North America.

18. Defendant Wippler, as Project Manager, personally: (a) received, reviewed, and was responsible for responding to Notices of Violation and enforcement orders issued by the San Diego Regional Water Quality Control Board concerning the SBIWTP's permit non-compliance;[14] (b) reviewed Veolia's annual compliance certifications submitted to USIBWC and the San

[14] *See* Cal. Reg'l Water Quality Control Bd., San Diego Region, *Order No. R9-2021-0001* (NPDES Permit) (enforced by the San Diego Water Board); Cal. Reg'l Water Quality Control Bd., San Diego Region, *Time Schedule Order No. R9-2023-0189* (documenting ongoing compliance obligations and enforcement oversight of the SBIWTP).

Diego Water Board, certifying operational reports that he knew or should have known failed to fully disclose the scope of deferred maintenance and equipment deficiencies [15]; (c) made, directed, or approved operational decisions to defer maintenance items identified in Veolia's internal reports, including decisions not to address known deficiencies in the Hollister Street Pump Station surge tank pressure relief system; and (d) with full knowledge of the severe and ongoing pollution affecting South Bay residents, consciously chose to defer corrective maintenance actions within his authority and budget to accomplish. Wippler's knowing disregard of residents' safety in the face of actual knowledge of risk constitutes malice, oppression, or fraud within the meaning of California Civil Code section 3294, warranting an award of punitive damages.

19. Defendant JACOB SCHMIDT ("Schmidt") is an employee of Veolia who resides in California. At all times relevant to the facts and circumstances alleged in this pleading, Mr. Schmidt was Operations Manager at the SBIWTP. Defendant Schmidt, as Operations Manager, was personally responsible for: (a) directing and overseeing the daily operations of the treatment plant, including compliance with applicable environmental and safety regulations; (b) managing operational functions to ensure consistent treatment performance at the SBIWTP and to prevent the illegal discharge of raw sewage,

---

[15] *See* 40 C.F.R. § 127.11 (requiring NPDES-regulated entities to submit compliance reports subject to certification).

sludge, and contaminated effluent into the surrounding environment, including the Pacific Ocean, Tijuana River, and nearby communities; (c) ensuring operational compliance with the NPDES Permit and related cease-and-desist and time schedule orders, including obligations to prevent discharges that cause public nuisance or endanger public health; (d) supervising operational staff to maintain proper functioning of bar screens, pumps, sedimentation tanks, and equalization basins—components which, when inoperative or mismanaged, caused the direct release of harmful pollutants and odors affecting Plaintiffs' property, health, and safety; (e) participating in or overseeing reviews and updates to the Spill and Transboundary Flow Event Prevention and Response Plan and ensuring timely responses to sediment overloads and transboundary flows entering canyon collectors like Smuggler's Gulch and Goat Canyon; and (f) ensuring accurate and timely self-monitoring reports and data submissions and addressing violations and permit exceedances—including repeated failures since July 2022 to meet effluent limits for suspended solids and biochemical oxygen demand, contributing to environmental contamination and health risks.

20. Defendant RANDY FREUND ("Freund") is a Veolia employee who resides in California. At all times relevant to the facts and circumstances alleged herein, Freund was Maintenance Manager at the SBIWTP, and was personally responsible for: (a) ensuring the continuous and proper functioning of all mechanical systems at the SBIWTP; (b) managing and conducting preventive

and corrective maintenance of critical infrastructure at the Plant, including bar screens, pumps, aeration basins, sedimentation tanks, and solids-handling equipment; (c) ensuring that infrastructure issues were promptly addressed to prevent unlawful discharges and toxic air emissions; (d) maintaining compliance with Veolia's computerized maintenance management systems ("CMMS") and ensuring work orders were completed in a timely manner to mitigate potential environmental and health hazards; (e) identifying and resolving mechanical issues that contributed to recurring equipment failures, including deficiencies in influent pumps and primary sedimentation tanks, which resulted in the release of untreated or partially treated sewage into Host Waters and surrounding communities; and (f) overseeing the implementation of safety and compliance protocols to avoid regulatory violations and community exposure to hazardous air pollutants, including hydrogen sulfide and PCBs.

## FACTUAL ALLEGATIONS

21. The SBIWTP is located in the City of San Diego, near the U.S.-Mexico border. The Facility was constructed pursuant to the Water Quality Control Act of 1987, Pub. L. No. 100-4, to intercept and treat raw sewage and other pollutants flowing from Tijuana, Mexico into the United States via the Tijuana River.[16]

[16] Water Quality Control Act of 1987, Pub. L. No. 100-4, § 510(a), 101 Stat. 7 (1987).

22. The USIBWC owns and holds the NPDES Permit for the Facility. Veolia operates and maintains the Facility under a contract with USIBWC.17[17]

23. The NPDES Permit requires Veolia to: (a) capture wastewater flows from Mexico through a system of canyon collectors; (b) pump those flows to the SBIWTP for treatment; and (c) discharge treated effluent at no more than 25 MGD through the SBOO into the Pacific Ocean.[18]

24. The canyon collectors—including the Goat Canyon collector (capacity approximately 13 million gallons per day) and the Smuggler's Gulch collector (capacity approximately 67,000 gallons per day)—are critical components of the collection system. Without functioning canyon collectors, untreated transboundary flows bypass the Facility and discharge directly into the Tijuana River Estuary and the Pacific Ocean at Imperial Beach. [19]

25. The USIBWC-Veolia contractual framework establishes two distinct spheres of responsibility. Specifically, USIBWC retains authority over: major capital expenditures exceeding $100,000; strategic plant upgrades and modernization; permit compliance oversight at the agency level; and diplomatic coordination with Mexico through IBWC channels. In contrast, Veolia bears

[17] NPDES Order No. R9-2021-0001, as amended by Order No. R9-2023-0009, Permit No. CA0108928, Waste Discharge Requirements for the U.S. Section of the Int'l Boundary Water Comm'n, S. Bay Int'l Wastewater Treatment Plant (Cal. Reg'l Water Quality Control Bd., San Diego Region, May 12, 2021), https://www.waterboards.ca.gov/sandiego/water_issues/programs/iwtp/.

[18] NPDES Order No. R9-2021-0001; §§ 3.1, 4.1.1.1; Attachment F (Fact Sheet); F-7, *supra* note 1.

[19] 19 NPDES Order No. R9-2021-0001, Attachment F (Fact Sheet); F-7, *supra* note 1; Investigative Order No. R9-2025-0022, at 2 (Cal. Reg'l Water Quality Control Bd., San Diego Region, Feb. 18, 2025), https://www.waterboards.ca.gov/sandiego/board_decisions/adopted_orders/2025/r9-2025-0022.pdf.

sole and exclusive responsibility for all day-to-day operation and maintenance, including: canyon collector clearing and sediment removal (Contract Section C.2.3, designating Veolia as "solely responsible"); pump station inspections, maintenance, and repair; odor control equipment operation; effluent sampling and laboratory testing; equipment maintenance, servicing, and repair for all items up to $100,000; system monitoring and reporting; preparation of Annual Deferred Maintenance and Repairs Reports; and regulatory agency coordination. None of these operational duties is subject to USIBWC direction on a task-by-task basis, nor do they implicate any treaty obligation, IBWC Minute, or diplomatic arrangement between the United States and Mexico. They are the routine contractual duties of a private wastewater treatment operator for which Veolia alone bears direct and exclusive responsibility. Critically, the USIBWC-Veolia contract expressly assigns Veolia sole responsibility for canyon collector maintenance (Contract Section C.2.3) and expressly holds Veolia responsible for fines resulting from its own negligence (Contract Section C.3.2(f)(6)). Veolia did not require USIBWC approval, congressional appropriation, or treaty revision to clear sediment from the canyon collectors, service a surge tank pressure relief valve, or implement its Annual Deferred Maintenance and Repairs Report. These were entirely within Veolia's unilateral $100,000 expenditure authority and required no government direction. Each specific

operational failure described herein was Veolia's own choice, not a mandate from USIBWC.

26. USIBWC is not an indispensable party under Federal Rule of Civil Procedure 19. Plaintiffs seek only compensatory and punitive damages for Veolia's breaches of its own independent contractual duties. Because Plaintiffs do not seek injunctive relief against any party, complete relief can be awarded against Defendants without USIBWC's presence. *See* Fed. R. Civ. P. 19(a)(1)(A). All damages Plaintiffs seek flow from specific operational failures that were entirely within Veolia's unilateral authority: deferred preventive maintenance on the Hollister Street pump station surge tank, failure to clear canyon collector sediment, and failure to prepare required Annual Deferred Maintenance and Repairs Reports. None of those failures required USIBWC direction, approval, or funding, and none implicates any treaty obligation. A court can determine Veolia's proportionate liability for these discrete maintenance failures without adjudicating USIBWC's fault or imputing liability to the United States.

27. Rule 19(a)(1)(B)(ii) does not apply because Defendants face no risk of inconsistent obligations from USIBWC's absence. USIBWC never directed Veolia to defer maintenance on the Hollister Street surge tank, to forgo canyon collector clearing, or to omit chronic toxicity data from its self-monitoring reports. There is no USIBWC directive with which a damages award would be

inconsistent, because the specific failures alleged in ¶¶ 30–33 and ¶ 49 were Veolia's own operational choices made within its exclusive contractual authority. *EEOC v. Peabody W. Coal Co.*, 610 F.3d 1070, 1081 (9th Cir. 2010) (inconsistent obligations arise when a party must act differently toward different parties, not when a defendant faces liability for its own negligence). Further, the Rule 19(b) equitable factors favor proceeding with this action: Plaintiffs seek only money damages, not specific performance of treaty obligations; USIBWC's interests are not implicated by a damages award against a private contractor for the contractor's own maintenance failures; and dismissal would leave Plaintiffs with no adequate alternative remedy for Veolia's negligence.

28. Since at least 2017, Veolia, despite contractual language requiring it to comply with the terms of the NPDES permit, has repeatedly violated it by discharging pollutants in excess of permit limits through the SBOO and through unpermitted discharges into the Tijuana River and Estuary.[20] The violations span multiple pollutant parameters and discharge types.[21] In 2023 alone, PCB discharges from the SBOO exceeded the Permit limit by approximately

[20] Feb. 2025 EOR, *supra* note 1, at 9 ("So far, the San Diego Water Board has issued 15 notices of violation (NOVs) to USIBWC. The NOVs include alleged violations related to effluent exceedances, late report submissions, inadequate maintenance, and unauthorized discharges of waste."); Complaint for Declaratory & Injunctive Relief & Civil Penalties paragraphs 5, 76-82, *San Diego Coastkeeper v. U.S. Int'l Boundary & Water Comm'n*, No. 3:24-cv-00663-JES-VET (S.D. Cal. Apr. 11, 2024) (documenting specific pollutant parameter exceedances and permit violations).

[21] Compl. for Decl. and Inj. Relief and Civ. Penalties at ¶ 5, 12–14, 25, *San Diego Coastkeeper v. U.S. Section of the Int'l Boundary & Water Comm'n*, No. 3:24-cv-00663-JES-VET (S.D. Cal. filed Apr. 11, 2024), ECF No. 1; Cal. Reg'l Water Quality Control Bd., San Diego Region, Executive Officer's Report 9 (Feb. 12, 2025).

22,122%, and benzidine discharges exceeded the Permit limit by approximately 15,052%.[22] The Facility has also repeatedly violated effluent limitations for total suspended solids ("TSS"), settleable solids, carbonaceous biochemical oxygen demand ("CBOD5"), turbidity, nitrogen, phosphorus, lead, fecal coliform, and enterococci.[23] Since 2019, the Facility has failed to report chronic toxicity data in its self-monitoring reports, itself a separate and ongoing violation of the Permit's reporting requirements.[24] [25]

29. The San Diego Regional Water Quality Control Board has responded to these violations with a sequence of escalating enforcement actions, each of which Veolia received and failed to remedy:

- May 12, 2021: The Board adopted NPDES Permit Order No. R9-2021-0001 ("NPDES No. CA0108928") and simultaneously issued Cease and Desist Order No. R9-2021-0107 ("CDO"), finding that the SBIWTP's

---

[22] Compl. for Decl. and Injunc. Rel. and Civ. Penalties at 5, *San Diego Coastkeeper v. U.S. Section of the Int'l Boundary & Water Comm'n*, No. 3:24-cv-00663-JES-VET (S.D. Cal. filed Apr. 11, 2024), ECF No. 1.

[23] Ltr. from Coastal Envtl. Rights Found. & San Diego Coastkeeper to Maria-Elena Giner, Comm'r, U.S. Section, Int'l Boundary & Water Comm'n, Re: Clean Water Act Not. of Intent to Sue, at 11–13 (Dec. 28, 2023), https://www.sdcoastkeeper.org/wp-content/uploads/2024/01/60-Day-Notice.IBWC_.pdf; see also Compl. at 5, *San Diego Coastkeeper v. U.S. Section of the Int'l Boundary & Water Comm'n*, No. 3:24-cv-00663-JES-VET (S.D. Cal. filed Apr. 11, 2024), ECF No. 1.

[24] Compl. for Decl. and Injunc. Rel. and Civ. Penalties, ¶ 5, 76-82, *San Diego Coastkeeper v. U.S. Int'l Boundary Water Comm'n*, No. 3:24-cv-00663-JES-VET (S.D. Cal. Apr. 11, 2024) [hereinafter *Coastkeeper* Compl.], https://www.courthousenews.com/wp-content/uploads/2025/01/san-diego-coastkeeper-v-united-states-international-boundary-and-water-commission-complaint.pdf.

[25] 60-Day Notice of Intent to Sue Under the Clean Water Act, *San Diego Coastkeeper & Coastal Envt'l. Rights Found. v. U.S. Int'l Boundary Water Comm'n*, at 32 (Dec. 28, 2023), https://www.sdcoastkeeper.org/wp-content/uploads/2024/01/60-Day-Notice.IBWC_.pdf.

effluent threatened to violate permit limits and directing USIBWC/Veolia to complete necessary maintenance and repairs on a binding schedule.[26]

- December 21, 2021: The Board amended the CDO ("Order No. R9-2021-0220") to require quarterly compliance assurance reports after USIBWC/Veolia failed to meet the original schedule.[27]
- December 18, 2023: The Board adopted Time Schedule Order No. R9-2023-0189 ("TSO"), establishing a hard deadline of August 15, 2024 for full compliance with secondary effluent limitations. The TSO also required USIBWC to present an oral compliance report to the Board within 180 days.[28]
- August 15, 2024: The TSO compliance deadline passed.[29] USIBWC remained out of compliance with secondary effluent standards—a condition that had persisted continuously since at least January 3, 2022,[30]

---

[26] Cease & Desist Order No. R9-2021-0107, U.S. Section of the Int'l Boundary Water Comm'n S. Bay Int'l Wastewater Treatment Plant (Cal. Reg'l Water Quality Control Bd., San Diego Region, May 12, 2021), https://www.waterboards.ca.gov/sandiego/water_issues/programs/iwtp/.

[27] Order No. R9-2021-0220, Amending Cease & Desist Order No. R9-2021-0107 (Cal. Reg'l Water Quality Control Bd., San Diego Region, Dec. 21, 2021), https://www.waterboards.ca.gov/sandiego/water_issues/programs/iwtp/.

[28] Time Schedule Order No. R9-2023-0189, U.S. Section of the Int'l Boundary Water Comm'n S. Bay Int'l Wastewater Treatment Plant (Cal. Reg'l Water Quality Control Bd., San Diego Region, Dec. 18, 2023), https://www.waterboards.ca.gov/sandiego/water_issues/programs/iwtp/.

[29] Cal. Reg'l Water Quality Control Bd., San Diego Region, Time Schedule Order No. R9-2023-0189, at 8, Directive No. 1 & Table 1, Task J (Dec. 18, 2023).

[30] Cal. Reg'l Water Quality Control Bd., San Diego Region, Time Schedule Order No. R9-2023-0189, at 4, Table 1, Task J (Dec. 18, 2023) (noting January 3, 2022 CDO deadline for effluent limitation compliance remained "Outstanding" as of December 2023).

the original CDO deadline for achieving effluent limitation compliance, through the TSO deadline and into the fall of 2024. Even after USIBWC finally attained secondary treatment compliance in November 2024, violations continued: TSS percent removal achieved only 84.09% against the required 85% minimum, and settleable solids reached 5 ml/L[31] against a 3 ml/L instantaneous maximum. Veolia had been operating under active spill event conditions since June 17, 2024 (addressed in ¶¶ 30–31 below).[32]

- September 25, 2024: The Board issued NOV No. R9-2024-0146 documenting the June–September 2024 spill event violations.
- February 6, 2025: The Board issued NOV No. R9-2025-0019 for the January 2025 pump station failure and resulting spill events at Smuggler's Gulch and Goat Canyon (addressed in ¶ 32 below).
- February 18, 2025: The Board issued Investigative Order No. R9-2025-0022, directing USIBWC and Veolia to submit technical reports on both spill events and on the recurring Hollister Street Pump Station failures.[33]

[31] Cal. Reg'l Water Quality Control Bd., San Diego Region, Cease and Desist Order No. R9-2025-0139, ¶ 10 (Aug. 27, 2025).

[32] Cal. Reg'l Water Quality Control Bd., San Diego Region, Investigative Order No. R9-2025-0022, at 1–2 (Feb. 18, 2025).

[33] Investigative Order No. R9-2025-0022, Related to Non-Compliance at Hollister St. Pump Station; the Goat Canyon and Smuggler's Gulch Canyon Collectors (Cal. Reg'l Water Quality Control Bd., San Diego Region, Feb. 18, 2025), https://www.waterboards.ca.gov/sandiego/board_decisions/adopted_orders/2025/r9-2025-0022.pdf [hereinafter Investigative Order].

As of February 2025, the Board had issued at least fifteen (15) Notices of Violation to USIBWC (as Veolia's principal) documenting Veolia's operational failures.[34] Each NOV was received, reviewed, and responded to by Veolia's Project Manager, Defendant Wippler. Each constituted actual notice that Veolia's failures were causing ongoing harm to South Bay residents. Each failure to correct within Veolia's authority thereafter was a knowing choice.

30. On June 17, 2024, the surge tank pressure relief valve at the Hollister Street Pump Station failed, causing approximately 302,000 gallons of untreated wastewater to spill. This failure resulted from Veolia's failure to perform required preventive maintenance within its sole operational authority under the contract.[35]

31. On August 28, 2024, a flooding event at the Hollister Street Pump Station released approximately 20,000 gallons of sewage onto Hollister Street. Veolia had authority and obligation to prevent this event through routine maintenance protocols.[36]

---

[34] Cal. Reg'l Water Quality Control Bd., San Diego Region, Executive Officer's Report 9–10 & n.3 (Feb. 12, 2025) (listing fifteen NOVs by CIWQS Regulatory Measure IDs 453821, 454744, 455044, 455365, 455560, 455817, 456626, 456899, 457813, 458177, 458474, 458504, 458719, 459259, and 459545).

[35] NOV No. R9-2024-0146, Notice of Violation to U.S. Section of the Int'l Boundary Water Comm'n (Cal. Reg'l Water Quality Control Bd., San Diego Region, Sept. 25, 2024); Investigative Order, *supra* note 33, at 2.

[36] NOV No. R9-2024-0146, *supra* n. 35; *see also* Cal. Coastal Comm'n, Staff Rpt. app., *supra* note 5 (Hollister Street flooding event, Aug. 28, 2024).

32. On January 1, 2025, another operational failure at the Hollister Street Pump Station triggered a multi-week spill event. From January 1 through January 23, 2025, the pump station remained out of service, causing approximately 4.2 million gallons of wastewater to bypass the SBIWTP and discharge into the Tijuana River—a water of the United States and/or State. During this period, dry weather transboundary flows at both Goat Canyon and Smuggler's Gulch were at or below their design capacity, meaning all such flows should have been captured and treated. The San Diego Water Board issued NOV No. R9-2025-0019 on February 6, 2025, for this failure.[37] Veolia's deferred maintenance practices—specifically its failure to prepare and implement its Annual Deferred Maintenance and Repairs Report as required by Contract Section C.3.2—directly contributed to this and similar spills.

33. From June 17, 2024 through September 15, 2024 alone, Veolia's operational failures caused approximately 58.8 million gallons of wastewater to be discharged into the Tijuana River in violation of Veolia's contract with USIBWC and USIBWC's NPDES Permit.[38] This volume caused severe and prolonged contamination of the Tijuana River Estuary, the Pacific Ocean

---

[37] NOV No. R9-2025-0019, Notice of Violation to U.S. Section of the Int'l Boundary Water Comm'n (Cal. Reg'l Water Quality Control Bd., San Diego Region, Feb. 6, 2025); Investigative Order, *supra* note 33, at 3–4 (reporting pump station failure from Jan. 1 through Jan. 23, 2025 and 4.2 million gallons discharged).

[38] Cal. Reg'l Water Quality Control Bd., San Diego Region, Investigative Order No. R9-2025-0022, at 1–2 (Feb. 18, 2025), https://www.waterboards.ca.gov/sandiego/board_decisions/adopted_orders/2025/r9-2025-0022.pdf.

shoreline at Imperial Beach,[39] and the air breathed by Plaintiffs. The Water Board confirmed in Investigative Order No. R9-2025-0022 that during this entire 91-day period, all dry weather transboundary flows at Goat Canyon and Smuggler's Gulch were at or below the canyon collectors' maximum design capacity—meaning Veolia had both the physical capacity and the contractual obligation to capture those flows but failed to do so.[40]

34. The regulatory record described above establishes that Veolia's violations were not isolated operational failures but a sustained pattern of knowing non-compliance. Veolia received actual or constructive notice of the CDO in May 2021.[41] It received the amended CDO in December 2021.[42] It received the TSO in December 2023 with a hard August 15, 2024 deadline,[43] and missed that deadline while simultaneously managing the 91-day Hollister

---

[39] *See* Cal. Reg'l Water Quality Control Bd., San Diego Region, Investigative Order No. R9-2025-0022, at 1–2 (Feb. 18, 2025); Cal. Reg'l Water Quality Control Bd., San Diego Region, Executive Officer's Report 11–12 (Feb. 12, 2025) (documenting ongoing closure of beaches from Border Field State Park to Imperial Beach due to pathogen risk from transboundary flows and associated estuary impacts); Benjamin Rico et al., *Heavily Polluted Tijuana River Drives Regional Air Quality Crisis* 3–5 (ChemRxiv preprint, Dec. 12, 2024), https://doi.org/10.26434/chemrxiv-2024-mjgbr (noting this is a preprint that has not yet been peer reviewed).

[40] Investigative Order, *supra* note 33, at 2–3 (reporting that "[f]rom June 17, 2024, through September 15, 2024, approximately 58.8 million gallons of wastewater failed to be diverted to the SBIWTP and discharged into the Tijuana River" and confirming all flows were within canyon collector design capacity throughout the 91-day period).

[41] Cal. Reg'l Water Quality Control Bd., San Diego Region, Cease and Desist Order No. R9-2021-0107 (May 12, 2021); *see also* Cal. Reg'l Water Quality Control Bd., San Diego Region, Time Schedule Order No. R9-2023-0189, ¶¶ 5–6 (Dec. 18, 2023) (describing CDO issuance and USIBWC's obligations thereunder).

[42] Cal. Reg'l Water Quality Control Bd., San Diego Region, Time Schedule Order No. R9-2023-0189, ¶¶ 5–6 (Dec. 18, 2023) (describing CDO issuance and USIBWC's obligations thereunder).

[43] Cal. Reg'l Water Quality Control Bd., San Diego Region, Time Schedule Order No. R9-2023-0189, at 8, Directive No. 1 (Dec. 18, 2023), https://www.waterboards.ca.gov/sandiego/board_decisions/adopted_orders/2023/r9_2023_0189.pdf.

Street spill event that began June 17, 2024.[44] It received NOV No. R9-2024-0146 in September 2024, and NOV No. R9-2025-0019 in February 2025 for the recurrence of the exact same pump station failure.[45] Each successive enforcement action documented a failure mode Veolia knew about, had authority to correct within its $100,000 maintenance budget, and chose not to remediate. This pattern of knowing non-compliance in the face of escalating regulatory orders constitutes the conscious disregard required to support punitive damages under California Civil Code section 3294.

35. Veolia's entitlement to invoke derivative sovereign immunity under *Yearsley v. W.A. Ross Constr. Co.*, 309 U.S. 18 (1940), is defeated by specific acts and omissions within Veolia's sole contractual authority, for which no USIBWC direction was required and none was given: (a) Veolia failed to perform routine sediment removal and debris clearing from the Goat Canyon and Smuggler's Gulch canyon collectors, despite Contract Section C.2.3 designating Veolia as "solely responsible" for clearing and disposing of all

---

[44] Cal. Reg'l Water Quality Control Bd., San Diego Region, Investigative Order No. R9-2025-0022, at 1–2 (Feb. 18, 2025) ("During this 91-day Spill Event, all dry weather transboundary flows at Goat Canyon and Smuggler's Gulch were less than or equal to the canyon collector's maximum design capacity."), https://www.waterboards.ca.gov/sandiego/board_decisions/adopted_orders/2025/r9-2025-0022.pdf; see *also* Cal. Reg'l Water Quality Control Bd., San Diego Region, Cease and Desist Order No. R9-2025-0139, ¶ 10 (Aug. 27, 2025) (confirming compliance achieved November 2024).

[45] Cal. Reg'l Water Quality Control Bd., San Diego Region, Investigative Order No. R9-2025-0022, at 1 n.1, 4 (Feb. 18, 2025) (identifying NOV No. R9-2024-0146 (Sept. 25, 2024) and NOV No. R9-2025-0019 (Feb. 6, 2025) as attachments, and noting that the January 2025 pump station failure involved "the same pressure relief valve that failed on June 17, 2024"), https://www.waterboards.ca.gov/sandiego/board_decisions/adopted_orders/2025/r9-2025-0022.pdf.

debris from the Canyon Collection Systems during regular operations, maintenance, and repair activities;[46] (b) Veolia failed to perform required preventive maintenance on the Hollister Street Pump Station surge tank pressure relief valve, which failed on June 17, 2024, causing approximately 302,000 gallons of untreated wastewater to spill;[47] (c) Veolia failed to prepare and implement its Annual Deferred Maintenance and Repairs Report as contractually required by Contract Section C.3.2, thereby concealing known infrastructure deficiencies from USIBWC and regulators;[48] and (d) Veolia expressly accepted, in Contract Section C.3.2(f)(6), "responsibility for the payment of fines and/or civil penalties levied against the government and/or the Contractor by any regulatory agency . . . resulting from the Contractor's negligence"—Veolia's own contractual acknowledgment that its negligent

[46] O&M Contract Between U.S. Section, Int'l Boundary & Water Comm'n and Veolia Water N. Am.-W., LLC, § C.2.3 (contract date).

[47] Cal. Reg'l Water Quality Control Bd., San Diego Region, Investigative Order No. R9-2025-0022, at 2–4 (Feb. 18, 2025) (noting June 17, 2024 "operational failure at the Hollister Street Pump Station" resulting in "an estimated 302,000-gallon release of wastewater," and finding that "the cause of the initial Spill Event at Hollister Street Pump Station was failure of the surge tank pressure relief valve," and directing USIBWC to explain "why failed assets were not adequately maintained or scheduled for replacement prior to the Spill Events"), https://www.waterboards.ca.gov/sandiego/board_decisions/adopted_orders/2025/r9-2025-0022.pdf.

[48] *See* Cal. Reg'l Water Quality Control Bd., San Diego Region, Time Schedule Order No. R9-2023-0189, ¶¶ 11, 16 (Dec. 18, 2023) (documenting that infrastructure deficiencies including inoperable Junction Box 1 gate valves, clogged bar screens, inoperable influent pumps, and overloaded primary sedimentation tanks were "exacerbated by a lack of investment in critical infrastructure maintenance and upgrades"); Cal. Reg'l Water Quality Control Bd., San Diego Region, Investigative Order No. R9-2025-0022, at 7, § 1.b.i (Feb. 18, 2025) (directing production of "the last three years of USIBWC and Veolia inspection reports, operation and maintenance reports, and annual conditions assessment reports that include Hollister Street Pump Station"); Ltr. from Yana Garcia, Sec'y for Envtl. Prot., & Wade Crowfoot, Sec'y for Nat. Res., to Senator Alex Padilla et al., at 2 (June 30, 2023) ("During the recent May 4, 2023, meeting of the USMCA Eligible Public Entities stakeholder group, the IBWC explained that the significant rehabilitation needs are due to deferred maintenance given its limited operations and maintenance budget.").

performance is distinct from any governmental direction.[49] None of these failures was directed, authorized, or supervised by USIBWC, and none required USIBWC approval.

36. Veolia's conduct is not shielded by the discretionary function exception. The Ninth Circuit has held that *Yearsley* protection is "limited to cases in which a contractor had no discretion in the design process and completely followed government specifications," and does not extend to contractors "exercising a discretionary governmental function." *Cabalce v. Thomas E. Blanchard & Assocs., Inc.*, 797 F.3d 720, 732 (9th Cir. 2015) (quoting *In re Hanford Nuclear Rsrv. Litig.*, 534 F.3d 986, 1001 (9th Cir. 2008)). Moreover, the Ninth Circuit has held that a contractor may be liable for acts "not in conformity" with its contract. *Myers v. United States*, 323 F.2d 580, 583 (9th Cir. 1963). The Supreme Court confirmed in *GEO Group, Inc. v. Menocal*, 607 U.S. 438 (2026) (unanimous), that *Yearsley* provides only a potential merits defense, not an immunity from suit, and that a contractor that "independently develops and implements" its challenged conduct receives no *Yearsley* protection. The specific failures alleged herein are not governmental discretionary decisions; they are instead ministerial operational obligations that Veolia itself accepted. As detailed in ¶ 35, each specific failure—such as

[49] O&M Contract Between U.S. Section, Int'l Boundary & Water Comm'n and Veolia Water N. Am.-W., LLC, § C.3.2(f)(6).

collector sediment removal, pump station maintenance, Annual Deferred Maintenance reporting, and Veolia's contractual assumption of regulatory fine responsibility—was expressly mandated by the contract or fell within Veolia's unilateral authority, placing it outside any *Yearsley* defense. Ministerial operational failures are categorically outside both *Yearsley* and the discretionary function exception. *See United States v. Gaubert*, 499 U.S. 315, 322–23 (1991) (discretionary function requires element of judgment or choice—conduct mandated by a specific contractual or regulatory standard is not discretionary).

37. Plaintiffs' state tort claims are not preempted by federal foreign affairs law. Foreign affairs preemption applies only to state laws or regulations that directly and purposefully intrude on the federal government's exclusive authority over foreign relations. *Zschernig v. Miller,* 389 U.S. 429 (1968); *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396 (2003). This doctrine does not preempt state tort law of neutral applicability. Plaintiffs' claims do not derive from state laws affecting foreign relations, but are instead individualized common law tort claims brought by California residents for personal injury and property damage caused by a private domestic corporation within the United States. These claims apply neutrally to any polluting actor within California and have no purpose of regulating foreign affairs or expressing a state position on U.S.-Mexico relations. The 1944 Water Treaty and IBWC Minutes govern the obligations of the two national governments—they impose no duties on, and confer no

protections on, a private domestic corporation like Veolia. The treaty framework is directed at USIBWC, not at Veolia, and does not address private contractor liability. *See Crosby v. National Foreign Trade Council*, 530 U.S. 363 (2000) (federal law preempts state law only where the state law stands as an obstacle to a specific federal objective; no such conflict exists here, where Plaintiffs' claims fill a liability gap that federal law leaves unoccupied). Plaintiffs' claims neither obstruct nor are in conflict with any treaty obligation or federal foreign affairs policy. Holding a domestic contractor liable for negligent maintenance does not impair the United States' diplomatic relationship with Mexico or its obligations under the 1944 Water Treaty. Similarly, conflict preemption is not at issue because it assumes that Plaintiffs' theory "contradicts" the Executive's position that Mexico bears primary responsibility for the sewage crisis. It does not. Mexico's responsibility for transboundary sewage flows and Veolia's independent liability for failing to capture flows within its Facility's design capacity are entirely compatible theories. A factfinder can conclude that Mexico is the source of the raw sewage AND that Veolia separately failed to treat the portion of those flows that fell within the Facility's capacity—as Investigative Order No. R9-2025-0022 confirms. A verdict against Veolia does not require the Court to apportion any fault to Mexico. Nor would such a verdict impose obligations beyond the negotiated binational framework, as Plaintiffs challenge only Veolia's failure to perform duties already expressly assigned to it by

contract (¶¶ 25, 49). The 1944 Treaty's dispute resolution framework (Art. 25) governs disputes between the two national governments, not tort claims by private citizens against a private domestic corporation.

38. Plaintiffs' state law tort claims are not preempted by the Clean Water Act or the Water Quality Control Act of 1987. The CWA contains an explicit savings clause, 33 U.S.C. § 1365(e), providing that "nothing in this section shall restrict any right which any person [. . .] may have under any statute or common law to seek enforcement of any effluent standard or limitation or to seek any other relief." The CWA thus expressly preserves state and common law remedies. *See also Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 251 (1984) (where Congress has not provided an alternative damages remedy for injury, it is difficult to believe Congress intended to eliminate state tort remedies). The Water Quality Control Act of 1987 (Pub. L. No. 100-4, § 510(a)) itself establishes protection of South Bay residents as the express purpose of the Plant's operation—state tort law is complementary to, not in conflict with, this federal purpose. Far from being an obstacle to federal objectives, Plaintiffs' claims enforce the precise duties that federal law imposed on Veolia's operations. There is no field preemption because Congress has not occupied the field of private contractor liability for sewage treatment negligence, and no federal statute establishes remedies for residents injured by a private operator's maintenance failures. Conflict preemption is inapplicable

because it is perfectly possible for Veolia to comply with both the NPDES Permit and California tort law simultaneously. Plaintiffs' claims are premised on Veolia's failure to comply with the NPDES Permit; full Permit compliance would have prevented the harm and eliminated the tort liability entirely. While Veolia will argue that WQA Section 510 vests USIBWC with operational discretion that state tort law cannot second-guess, that discretion belongs to USIBWC and not to Veolia. Veolia is a private contractor, not a government agency, and the WQA confers no governmental discretion on it. None of the specific failures in ¶¶ 30–33 and ¶ 49 involves a policy judgment or resource allocation decision by USIBWC, since they are routine preventive maintenance tasks Veolia was contractually required to perform within its own $100,000 expenditure authority. Holding Veolia liable for those failures does not substitute the Court's judgment for USIBWC's policy discretion; it enforces a private contractor's own contractual obligations. The WQA's express purpose of protecting San Diego residents (Pub. L. No. 100-4, § 510(a)) compels the conclusion that state tort remedies are complementary to, not preempted by, that federal objective.

39. Veolia and its officers, directors, and managers—including Wippler, Schmidt, and Freund—have been aware of the ongoing pollution and its impacts on South Bay residents since at least 2017. That awareness is established by their receipt of Notices of Violation, Water Board enforcement

orders, community complaints, and media coverage, and by the fact that Wippler personally signed each annual compliance certification submitted during that period. Despite this actual knowledge, Defendants failed to take corrective action within their authority.

40. The Facility's failures have caused the beaches in South Bay communities to be closed for thousands of days[50] over the past decade, cutting off Plaintiffs from the use and enjoyment of their local environment, their properties, and their livelihoods.[51]




[50] Feb. 2025 EOR, *supra* note 1, at 12 ("[T]he beaches from Border Field State Park to Imperial Beach are also closed due to the risk from pathogens in the sewage in the transboundary flows. With a few recent exceptions...these beaches have been closed continuously since December 8, 2021."); *see also* City of Imperial Beach, Mayor Aguirre Press Release: Imperial Beach Beach Closures Reach 1,000 Consecutive Days (Sept. 3, 2024), https://www.imperialbeachca.gov/644/Tijuana-River-Pollution.

41. The level of contamination in the waters offshore of Imperial Beach and in the Tijuana River Estuary has been described as among the worst in the State of California,[52] with bacterial counts exceeding safe levels by thousands of times.[53] The contamination is so severe that it poses an imminent and ongoing threat to public health.[54]

42. Plaintiffs are informed and believe and based thereon allege that the level of contamination of the Tijuana River, Tijuana River Estuary, Pacific Ocean and beaches, and air in the South Bay has caused the Plaintiffs to suffer the following injuries and damages as set forth more fully below.

43. Plaintiffs' claims are timely. The contamination described herein is ongoing and continuing: each spill event, each additional day of beach closure, and each continued discharge constitutes a new and distinct injury, giving rise to a fresh limitations period under the continuing tort doctrine. *Mangini v. Aerojet-*

---

[51] City of Imperial Beach, Mayor Aguirre Press Release: Imperial Beach Closures Reach 1,000 Consecutive Days (Sept. 3, 2024), https://www.imperialbeachca.gov/644/Tijuana-River-Pollution; SDSU White Paper, *supra* note 11, at 4 (reporting 700-plus consecutive days of beach closures as of February 2024).

[52] Surfrider Found., Clean Water Rpt. 2024 (2024) (ranking Imperial Beach first among 567 sites tested nationally, with a 100% high bacteria rate—the only California beach and one of only two sites nationally where every sample exceeded recreational health standards), https://www.surfrider.org/programs/clean-water-initiative; *see also* Cal. Reg'l Water Quality Control Bd., San Diego Region, Executive Officer's Report 9 (Feb. 12, 2025) (noting beaches from Border Field State Park to Imperial Beach have been closed "due to the risk from pathogens in the sewage in the transboundary flows" continuously since December 8, 2021, with limited exceptions).

[53] *See, e.g.*, Compl. for Decl. and Injunc. Relief and Civ. Penalties at 5, *San Diego Coastkeeper v. U.S. Section of the Int'l Boundary & Water Comm'n*, No. 3:24-cv-00663-JES-VET (S.D. Cal. filed Apr. 11, 2024), ECF No. 1 (alleging that in 2023, PCB discharges from the SBOO exceeded the Permit limit by 22,122% and benzidine discharges exceeded the Permit limit by 15,052%).

[54] Cal. Reg'l Water Quality Control Bd., San Diego Region, Executive Officer's Report, at 4-5 (Dec. 11, 2024), https://www.waterboards.ca.gov/sandiego/publications_forms/publications/docs/executive_officer_reports/2024/

*General Corp.*, 12 Cal.4th 1087, 1103 (1996) (continuing nuisance and trespass give rise to successive causes of action, each accruing upon the causing of each successive injury). In the alternative, and to the extent any claim is based on conduct more than two years prior to filing, Plaintiffs invoke (a) the discovery rule under California Code of Civil Procedure section 340.8, which tolls the limitations period until the plaintiff discovered, or through reasonable diligence should have discovered, the physical injury and its cause.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**Negligence**
*[Against All Defendants]*

44. Plaintiffs reallege and incorporate by reference all of the above paragraphs of this Complaint as though fully stated herein.

45. Defendants owed a duty to Plaintiffs to ensure the proper treatment, handling, storage, and disposal of the wastewater flowing through the Facility and to ensure that wastewater was properly treated and to not expose Plaintiffs to hazardous substances, sewage, pollution, and other contaminants.

46. Veolia's duty of care to Plaintiffs arises from multiple independent sources beyond the general duty codified in Civil Code section 1714(a): (a) Veolia's NPDES Permit obligations — which the contract expressly requires

eor_12_11_2024.pdf; *Coastkeeper* Compl. ¶¶ 3, 5, *supra* note 24 (documenting bacterial counts thousands of

Veolia to comply with and for which Veolia accepted responsibility for resulting fines(Contract C.3.2(f)(6)) — establish the applicable standard of care for Veolia's operational conduct; (b) the Water Quality Control Act of 1987, Pub. L. No. 100-4, section 510(a), expressly identifies protection of the residents of "the city of San Diego, California, and surrounding areas" — including Imperial Beach — as the statutory purpose of the Plant's operation, establishing Plaintiffs as intended beneficiaries of Veolia's contractual performance, not merely incidental ones — because Congress itself expressly identified the residents of Imperial Beach as the persons the Plant exists to protect (WQA § 510(a)), there is no need for additional contract language to rebut the incidental-beneficiary presumption; the legislative intent is unmistakable and satisfies the standard articulated in *Orff v. United States*, 358 F.3d 1137 (9th Cir. 2004); (c) Veolia's contractual acceptance of regulatory fine responsibility (Contract C.3.2(f)(6)) reflects the parties' clear intent that Veolia be directly accountable for its own operational negligence; and (d) Veolia's more than twenty-five years of operation since 1997, combined with its actual knowledge through at least 15 Notices of Violation, multiple Cease and Desist Orders, and a Time Schedule Order — all documenting that its failures were causing foreseeable harm to Imperial Beach residents — establishes that the harm to Plaintiffs was both foreseeable and certain.

---

times above permit limits).

47. Defendant Wippler is independently and personally liable under each cause of action herein. As Project Manager, Wippler personally undertook the specific operational and compliance responsibilities described in ¶ 18, including signing compliance certifications and directing maintenance decisions. By personally assuming these responsibilities, Wippler owed an independent duty of care to Plaintiffs whose health and property were foreseeably in the zone of danger created by his decisions. Wippler is liable for each cause of action herein to the extent of his own personal participation in and authorization of the wrongful acts and omissions alleged. *Frances T. v. Village Green Owners Ass'n*, 42 Cal.3d 490 (1986).

48. Defendants breached their duty of care through specific, identifiable acts and omissions within Veolia's sole contractual authority: (a) failing to perform required preventive maintenance on the Hollister Street Pump Station surge tank pressure relief valve — a task within Veolia's unilateral $100,000 expenditure authority that Veolia's own internal reports identified as needed — causing the valve to fail on June 17, 2024 and resulting in 302,000 gallons of untreated wastewater spilling (¶ 28); (b) failing to clear accumulated sediment from the Goat Canyon and Smuggler's Gulch canyon collectors as expressly required by Contract Section C.2.3, which designates Veolia as "solely responsible" for that task; (c) failing to prepare and implement the Annual Deferred Maintenance and Repairs Report required by Contract

Section C.3.2, thereby concealing known equipment deficiencies from USIBWC and regulators; and (d) continuing to operate the Facility out of compliance with its NPDES Permit despite receiving Cease and Desist Order No. R9-2021-0107 (as amended), Time Schedule Order No. R9-2023-0189, Investigative Order No. R9-2025-0022, and at least 15 Notices of Violation. Each of these failures is a specific, identifiable operational decision by Veolia that was not authorized or directed by USIBWC and was within Veolia's unilateral contractual authority to correct.

49. Veolia breached its duty of care through the following specific acts and omissions within its sole operational authority — none of which required USIBWC approval, additional appropriation, or diplomatic coordination:

(a) Veolia failed to maintain adequate sediment removal protocols for the Goat Canyon collector (flow rate approximately 13 million gallons per day) and Smuggler's Gulch collector (flow rate approximately 67,000 gallons per day), causing these collectors to be taken out of service multiple times and resulting in untreated transboundary flows discharging directly into the ocean; (b) Veolia failed to perform preventive maintenance on the Hollister Street Pump Station surge tank pressure relief valve, which failed on June 17, 2024, causing approximately 302,000 gallons of untreated wastewater to spill; (c) Veolia failed to prevent a flooding event at the Hollister Street Pump Station on August 28, 2024, releasing approximately 20,000 gallons of sewage onto Hollister Street;

(d) Veolia failed to properly maintain the pump station, resulting in a recurring failure beginning January 1, 2025 that kept the station out of service for 23 days and caused approximately 4.2 million gallons of wastewater to bypass the SBIWTP and discharge into the Tijuana River; (e) Veolia failed to prepare and implement its Annual Deferred Maintenance and Repairs Report as required by Contract Section C.3.2, allowing known equipment deficiencies to persist unremediated; and (f) from June 17, 2024 through September 15, 2024 alone, Veolia's failures caused approximately 58.8 million gallons of wastewater to be discharged into the Tijuana River. Each of these specific failures was within Veolia's unilateral operational authority under its contract.

50. Defendants knew or should have known that their failure to comply with their NPDES Permit, to properly maintain the Facility, and to take corrective action upon receipt of Notices of Violation would cause harm to Plaintiffs.

51. Defendants' violation of their NPDES Permit, and of Water Board orders and notices as alleged here, is negligence per se because these statutes, orders, and rules seek to prevent the exact type of harm that Plaintiffs suffered because of Defendants' failure to comply with these statutes, orders, and rules. That is, Plaintiffs are within the class of individuals these statutes, orders, and rules were intended to protect — the Water Quality Control Act of 1987 (Pub. L. No. 100-4, § 510(a)) expressly identifies protection of the residents of "the city

of San Diego, California, and surrounding areas," including Imperial Beach, as the statutory purpose of the Plant's operation — and the contamination they suffered is the type of harm these laws sought to prevent. Defendants have been in continuous violation of Section 301(a) of the Clean Water Act (33 U.S.C. § 1311(a)) on thousands of documented occasions since November 2018, as documented in the self-monitoring reports Veolia signed and submitted, each of which constitutes a separate and distinct violation of the Permit and CWA.

52. The discharge of raw sewage, hazardous waste, and toxic contaminants in the volumes described herein does not ordinarily occur in the absence of negligence. The contamination was not caused by any voluntary action by Plaintiffs. The Facility's operational systems — including the canyon collectors, pump stations, and surge tanks that failed — were under Veolia's exclusive operational control pursuant to Contract Sections C.2.3 and C.3.2 at all times relevant herein. USIBWC exercised no task-by-task direction over these systems. Plaintiffs therefore satisfy the elements of *res ipsa loquitur* under CACI No. 417. While Veolia may argue *res ipsa* is unavailable because "a third party could have caused" Plaintiffs' injuries, this ignores that the specific harm at issue here — the untreated wastewater discharges from the Facility's infrastructure into the Tijuana River during the June 17–September 15, 2024 and January 2025 spill events — was caused by the Facility's own system failures, not by flows exceeding design capacity. Investigative Order No. R9-2025-0022

expressly confirmed that during the entire 91-day June–September 2024 spill period, all dry weather transboundary flows at Goat Canyon and Smuggler's Gulch were at or below the canyon collectors' maximum design capacity. There was no intervening third-party cause: the sewage that bypassed treatment did so because Veolia's systems failed, not because Mexico sent more sewage than the Facility was designed to handle.

53. As a result of Defendants' negligence, Plaintiffs were exposed to pollutants, sewage, and hazardous waste in the air they breathe, the water they drink and use in their home, and the soil on their properties. Additionally, due to exposure to the contaminated water, air, and soil, Plaintiffs were and are exposed to dangerous and deadly pathogens, including E. coli, SARS-CoV2, hepatitis A, human norovirus, and other viruses and bacteria.

54. Plaintiffs cannot drink the water, shower, or bathe without risking exposure to pathogens, pollutants, sewage, and hazardous waste. Plaintiffs cannot open their windows or breathe the air outside without suffering exposure to pollutants, sewage, hazardous waste, and noxious odors. Plaintiffs have suffered and will continue to suffer injuries and illness from their exposure to the contaminated water and air. Plaintiffs' properties have also been damaged from pollutants, sewage, hazardous waste, and noxious odors that have invaded their properties.

55. Defendant Schmidt, as Operations Manager of the SBIWTP, personally owed a duty of care to Plaintiffs. As the individual charged with directing and overseeing the daily operations of the Facility, Schmidt was responsible for ensuring that treatment processes functioned in compliance with Defendants' NPDES Permit and regulatory orders. Schmidt's decisions foreseeably determined whether untreated sewage, pathogens, and toxic compounds would reach Plaintiffs' air, water, and properties. Schmidt personally assumed these operational responsibilities and thereby placed Plaintiffs squarely within the zone of danger created by his individual acts and omissions.

56. Defendant Schmidt personally breached his duty of care by failing to manage operational functions necessary to ensure consistent treatment performance at the SBIWTP. Specifically, Schmidt failed to oversee the operational staff responsible for maintaining bar screens, influent pumps, equalization basins, and primary sedimentation tanks in working condition, resulting in repeated equipment failures that substantially caused untreated or partially treated sewage to bypass the treatment process and discharge into the Tijuana River and Pacific Ocean at Imperial Beach.

57. Defendant Schmidt personally failed to ensure operational compliance with the NPDES Permit and the escalating enforcement orders issued by the San Diego Regional Water Quality Control Board, including

among them the at least fifteen Notices of Violation issued through February 2025. As Operations Manager, Schmidt was personally responsible for ensuring that Veolia's operational conduct met the permit's effluent limitations. Schmidt's failure to implement corrective operational measures within his authority after receiving actual notice of ongoing violations through the regulatory enforcement record constitutes a direct, personal breach of the duty of care Schmidt owed to Plaintiffs.

58. Defendant Schmidt personally failed to manage the canyon collector operations by failing to ensure timely responses to sediment overloads at Smuggler's Gulch and Goat Canyon as required under the Spill and Transboundary Flow Event Prevention and Response Plan, which substantially caused those collectors to go out of service on multiple occasions, allowing untreated transboundary flows to bypass treatment and discharge into the Tijuana River Estuary and the Pacific Ocean, contaminating the air breathed by Plaintiffs and the environment surrounding their properties.

59. Defendant Freund, as Maintenance Manager, was the individual responsible for ensuring the continuous and proper functioning of all mechanical systems at the Facility—including the Hollister Street Pump Station surge tank, canyon collectors, bar screens, influent pumps, and sedimentation tanks. Freund's maintenance decisions directly determined whether the Facility's pollution-capture infrastructure would function as required to prevent untreated

sewage from reaching Plaintiffs' air, water, and properties. Freund's personal assumption of these responsibilities placed Plaintiffs within the zone of danger created by his individual acts and omissions.

60. Freund breached his duty of care by failing to perform or ensure required preventive and corrective maintenance on the Hollister Street Pump Station surge tank pressure relief valve. The valve's degraded condition was a known equipment deficiency that was identifiable through Veolia's CMMS and reflected in internal maintenance reports, and that Freund, as Maintenance Manager, had personal authority and responsibility to remediate. Freund's failure to schedule and complete maintenance on this valve substantially caused millions of gallons of untreated wastewater to spill into the environment.

61. Defendant Freund failed to ensure that the Goat Canyon and Smuggler's Gulch canyon collectors were maintained free of sediment accumulation as required by Contract Section C.2.3, a task expressly within Veolia's "sole responsibility" and therefore within Freund's managerial authority. Freund's failure to maintain adequate sediment removal protocols for these collectors caused them to be taken out of service on multiple occasions, allowing untreated transboundary flows to bypass the SBIWTP and discharge directly into the Tijuana River Estuary and Pacific Ocean at Imperial Beach, contaminating the air, water, and properties of Plaintiffs.

62. Defendant Freund failed to properly prepare and implement the Annual Deferred Maintenance and Repairs Report required by Contract Section C.3.2. As Maintenance Manager, Freund bore primary operational responsibility for identifying, documenting, and escalating known equipment deficiencies through this report. Freund's failures concealed the true scope of the Facility's maintenance backlog from USIBWC and regulators, substantially causing and contributing to the deferred maintenance conditions that caused the equipment failures and discharge events that contaminated Plaintiffs' air, water, and property.

63. Defendants' negligence, including Defendants' negligence per se, was a substantial factor in causing Plaintiffs to suffer damages including, but not limited to, damage to real property, damage to structures, damage to personal property and cherished possessions, personal injuries, discomfort, annoyance, inconvenience, mental anguish, loss of quiet enjoyment, loss of business income, and emotional distress. Certain Plaintiffs operate rental properties, or other income-generating activities in the South Bay—including short-term and long-term rentals—each of which suffered direct economic losses from the beach closures and contamination alleged herein. Plaintiffs each seek damages to be determined, on an individual basis, according to proof at trial.

## SECOND CAUSE OF ACTION

**Public Nuisance**

*[Against All Defendants]*

64. Plaintiffs reallege and incorporate by reference all of the above paragraphs of this Complaint as though fully stated herein.

65. Plaintiffs are currently, and at all times relevant to this action were, the owners, tenants, and/or lawful occupiers of real property located in the South Bay, the area of the contamination.

66. Defendants' actions and inactions created a condition and/or permitted a condition to exist that undermined health, was offensive to the senses, obstructed the free use of property, and interfered with the comfortable enjoyment of life and property, unlawfully obstructed the free passage or use, in the typical manner, of public streets and highways.

67. These conditions created by Veolia interfered with Plaintiffs' physical health and quiet enjoyment of their properties in a way unique to each Plaintiff. Plaintiffs were and are continually exposed to pollutants, sewage, and hazardous waste in the air they breathe, the water they drink and use in their home, and the soil on their properties. Also, as a result of the contaminated water, air, and soil, Plaintiffs were and are exposed to dangerous and deadly pathogens, including E. coli, SARS-CoV2, hepatitis A, human norovirus, and other viruses. Each Plaintiff has suffered harm that is different in kind and degree from that suffered by the general public. Specifically, each Plaintiff's damages include individualized physical personal injury

from direct pathogen and chemical exposure, tangible physical intrusion of contaminants onto and into their privately owned real property, and specific quantifiable economic losses—none of which constitute generalized public harm. The general public, while also harmed by the nuisance, has not suffered the individualized property intrusion, direct personal physical injury, or specific economic losses experienced by each Plaintiff. This special injury satisfies California Civil Code section 3493 and confers standing on Plaintiffs to sue for public nuisance.

68. Wippler personally created and maintained the public nuisance by making the operational decisions that allowed untreated sewage to be discharged into the Tijuana River, Tijuana River Estuary, and Pacific Ocean at Imperial Beach. As the Project Manager with day-to-day authority over the Facility's maintenance and compliance, Wippler made ongoing affirmative choices to defer maintenance, which included his direction to defer servicing of the Hollister Street Pump Station surge tank pressure relief valve. Wippler's conduct therefore substantially caused the conditions underlying the nuisance affecting Plaintiffs.

69. Wippler had actual knowledge that his operational decisions were creating conditions offensive to the senses, threatening to public health, and interfering with Plaintiffs' use and enjoyment of their properties and the community's beaches. That knowledge is established, at minimum, by his personal receipt of fifteen Notices of Violation, the Cease and Desist Orders, and the Time Schedule Order—each of which expressly documented the harm being caused to

South Bay residents—as well as widespread media coverage and community complaints reviewed by him in his capacity as Project Manager.

70. Plaintiffs cannot drink the water, shower, or bathe without risking exposure to pathogens, pollutants, sewage, and hazardous waste. Plaintiffs cannot open their windows or breathe the air outside without suffering exposure to pollutants, sewage, hazardous waste, and noxious odors. Plaintiffs have suffered and will continue to suffer injuries and illness from their exposure to the contaminated water and air. Plaintiffs' properties have also been damaged from pollutants, sewage, hazardous waste, and noxious odors that have invaded their properties.

71. These conditions also affected many people at the same time.

72. At no time did Plaintiffs consent to Defendants' actions and inactions in creating these conditions.

73. An ordinary person would be reasonably annoyed and disturbed by Defendants' actions and inactions in creating these conditions.

74. Defendants' actions and inactions in creating these conditions were a substantial factor in causing Plaintiffs to suffer damages. And each Plaintiff's damages are different from damages suffered by other Plaintiffs. Those damages include, but are not limited to, destruction of and damage to real property, destruction of and damage to structures, destruction of and damage to personal property and cherished possessions, personal injuries, discomfort, annoyance, inconvenience,

mental anguish, loss of quiet enjoyment, and emotional distress. Plaintiffs each seek damages to be determined, on an individual basis, according to proof at trial.

75. The seriousness of the harm Defendants caused Plaintiffs substantially outweighs any public benefit that Defendants may provide. In assessing the balance, the gravity of harm to Plaintiffs—including personal physical injury, property contamination, loss of beach and recreational access for over 1,000 consecutive days, and aerosolized pathogen exposure—is severe, ongoing, and well-documented by state regulators. Defendants' contractual purpose is precisely to prevent these harms: Veolia is paid to treat sewage, and its chronic failure to do so eliminates any legitimate claim to social utility. The nuisance was not an unavoidable consequence of lawful operations but the direct result of Veolia's willful failures within its unilateral operational authority. *See* CACI No. 2022; *Wilson v. Southern California Edison Co.*, 234 Cal.App.4th 123 (2015).

76. Defendants, including one or more officers, directors, and/or managers, have deliberately, and repeatedly, ignored their obligations to prevent pollution, raw sewage, and hazardous substances from contaminating the air, water, and soil in Imperial Beach and the South Bay. Defendants have deliberately, and repeatedly, ignored complaints, issued by the San Diego Water Board, and violations received from the State Water Board related to the significant environmental impacts and harm caused by its handling, storage, treatment, transport, and/or disposal of hazardous and/or solid waste through its facilities. Specifically, Defendants received

Cease and Desist Order No. R9-2021-0107 in May 2021 and failed to achieve compliance within the required timeframes; received Time Schedule Order No. R9-2023-0189 in December 2023 establishing a hard compliance deadline of August 15, 2024 and failed to meet it; and received at least fifteen (15) Notices of Violation through February 2025, including NOV No. R9-2024-0146 (September 25, 2024) and NOV No. R9-2025-0019 (February 6, 2025). Defendant Wippler, as Project Manager, was responsible for responding to each of these enforcement actions, yet consciously chose to defer corrective maintenance within his budgetary authority rather than protect Plaintiffs' health and safety. This conduct was not inadvertent neglect but willful, knowing disregard of regulatory mandates and community harm.

77. Defendant Schmidt created and maintained the public nuisance by directing operational decisions that allowed untreated and partially treated sewage to be discharged into the Tijuana River, Tijuana River Estuary, and Pacific Ocean at Imperial Beach. As Operations Manager, Schmidt controlled the day-to-day operational conduct of the Facility. His personal failure to direct operational staff to maintain bar screens, pumps, and equalization basins in proper working condition, and his failure to ensure timely operational responses to canyon collector failures and transboundary flow events, were affirmative operational acts that substantially caused the conditions that comprise the nuisance.

78. Defendant Schmidt possessed operational authority to take corrective action by directing staff to address bar screen failures, pump station deficiencies, and

canyon collector sediment accumulation, and Schmidt consciously chose not to do so. That conscious choice, made with full awareness that residents of the South Bay were being physically harmed, constitutes the knowing disregard and willful conduct sufficient to render Schmidt liable for the public nuisance he assisted in creating and maintaining as to support an award of punitive damages under California Civil Code section 3294.

79. Defendant Freund created and maintained the public nuisance by making the maintenance decisions that allowed critical pollution-capture infrastructure at the SBIWTP to deteriorate to the point of failure. Freund decided to defer preventive and corrective maintenance on the Hollister Street Pump Station surge tank pressure relief valve, canyon collector sediment removal systems, bar screens, and influent pumps, all of which were within his CMMS work order authority. These decisions substantially caused the equipment failures that allowed untreated sewage to discharge into the Tijuana River, Tijuana River Estuary, and Pacific Ocean at Imperial Beach, creating the nuisance conditions that harmed Plaintiffs.

80. Defendant Freund had actual knowledge that his maintenance deferral decisions were creating conditions offensive to the senses, threatening to public health, and substantially interfering with Plaintiffs' use and enjoyment of their properties. Freund had access to and was aware of Veolia's internal maintenance records and CMMS work orders documenting known equipment deficiencies, the

fifteen Notices of Violation, enforcement orders, and the February 2025 Investigative Order, each of which documented that maintenance failures at the Facility were causing ongoing harm to South Bay residents.

81. Defendants know that allowing contaminated water to spread into the air, soil, water, and enter Plaintiffs' properties would cause a significant risk of injury and illness. Defendants acted recklessly and with conscious disregard to human life and safety, and this recklessness and conscious disregard was a substantial factor in bringing about Plaintiffs' harm. This is despicable and oppressive conduct. Plaintiffs thus seek punitive damages in an amount sufficient to punish Defendants' long history of deliberate disregard for Plaintiffs' safety.

## THIRD CAUSE OF ACTION
**Private Nuisance**
*[Against All Defendants]*

82. Plaintiffs reallege and incorporate by reference all of the above paragraphs of this Complaint as though fully stated herein.

83. Defendants, and/or each of them, by their acts and/or omissions set forth above, directly and legally caused an obstruction to the free use of Plaintiffs' property, an invasion of Plaintiffs' right to use their property, and/or a substantial and unreasonable interference with the enjoyment of Plaintiffs' property, resulting in Plaintiffs suffering unreasonable harm and substantial actual damages constituting a nuisance pursuant to California Civil Code sections 3479 and 3481.

84. Veolia created and actively maintained the nuisance through its own affirmative operational failures within its sole contractual authority: (a) by failing to clear accumulated sediment from the canyon collectors as contractually required—a task expressly assigned to Veolia under Contract Section C.2.3 with no USIBWC approval needed—Veolia affirmatively caused the collectors to become inoperable, which caused untreated transboundary flows to bypass treatment and discharge directly into the Tijuana River Estuary and the ocean at Imperial Beach; (b) by failing to maintain the Hollister Street Pump Station through routine preventive maintenance within its authority, Veolia affirmatively caused repeated sewage spills; and (c) Veolia's failures were not passive omissions but active mismanagement of pollution-control infrastructure that Veolia controlled. The nuisance conditions were also reasonably abatable by Veolia without USIBWC approval: all the specific maintenance tasks described herein fall within Veolia's unilateral $100,000 expenditure authority under the contract, required no capital appropriation, and could have been performed through ordinary maintenance operations. The cost and practicality of abatement were well within Veolia's means. *See Redevelopment Agency of City of Stockton v. BNSF Ry. Co.*, 643 F.3d 668, 675 (9th Cir. 2011). Veolia may argue it did not "create" the nuisance because it merely failed to prevent pollution. But Veolia affirmatively permitted the canyon collectors to fail by deliberately deferring sediment removal—a task Contract Section C.2.3 expressly assigns as Veolia's "sole responsibility"—and deliberately deferring maintenance on

the Hollister Street pump station. Allowing pollution-capture infrastructure to degrade through deliberate maintenance neglect is affirmative operational misconduct, not passive omission. *See BNSF*, 643 F.3d at 674 (defendant liable if it "actively or knowingly generate[s] or permit[s] the specific nuisance condition"). Similarly, while Veolia may argue it lacked authority to abate the nuisance because USIBWC controls major repairs, the specific measures Plaintiffs allege—clearing canyon collector sediment and servicing the Hollister Street pressure relief valve—required no USIBWC approval and fell within Veolia's exclusive $100,000 budget authority.

85. Wippler personally and affirmatively created the private nuisance interfering with Plaintiffs' use and enjoyment of their properties by directing, authorizing, or permitting the deferral of maintenance on the canyon collectors, the Hollister Street Pump Station surge tank, and other critical Facility infrastructure, all of which were within his operational authority. Wippler's conduct caused those systems to fail and resulted in untreated sewage and aerosolized pathogens physically entering and contaminating Plaintiffs' properties.

86. The private nuisance was reasonably abatable by Wippler personally. The specific corrective actions required—canyon collector sediment removal, pressure relief valve servicing, and preparation of the Annual Deferred Maintenance and Repairs Report required by Contract Section C.3.2—all fell within Veolia's unilateral $100,000 expenditure authority that Wippler directed and managed. No

USIBWC approval, capital appropriation, or diplomatic coordination was required. Wippler's individual failure to authorize these routine maintenance tasks was the proximate cause of the nuisance's continuance.

87. Wippler had actual knowledge that the maintenance failures he permitted or directed were causing aerosolized sewage particulates, fecal bacteria, pathogens, and compounds—including DDT, PCBs, and benzidine—to physically deposit on and enter Plaintiffs' homes, yards, and persons. Wippler's actual knowledge stems from his receipt of the regulatory enforcement record, the SDSU White Paper (February 2024) documenting the aerosolized exposure pathway, and community complaints submitted to Veolia during the period he served as Project Manager.

88. Plaintiffs were and are continually exposed to pollutants, sewage, and hazardous waste in the air they breathe, the water they drink and use in their homes, and the soil on their properties. Plaintiffs cannot drink the water, shower, or bathe without risking exposure to pollutants, sewage, and hazardous waste. Also, as a result of the contaminated water, air, and soil, Plaintiffs were and are exposed to dangerous and deadly pathogens, including E. coli, SARS-CoV2, hepatitis A, human norovirus, and other viruses.

89. Plaintiffs cannot open their windows or breathe the air outside without suffering exposure to pollutants, sewage, hazardous waste, and noxious odors. Plaintiffs have suffered and will continue to suffer injuries and illness from their

exposure to the contaminated water and air. Plaintiffs' properties have also been damaged from pollutants, sewage, hazardous waste, and noxious odors that have invaded their properties.

90. As a direct and proximate result of the wrongful acts and omissions of Defendants, and each of them, Plaintiffs suffered, and continue to suffer, the injuries and damages set forth above. Defendants' conduct was a substantial factor in causing that harm. Defendants' conduct was a substantial factor in causing the nuisance and Plaintiffs' resulting harm. The gravity of the harm to Plaintiffs substantially outweighs the social utility of Defendants' conduct, particularly because Defendants' contractual purpose is wastewater treatment—a function they chronically failed to perform—and because the nuisance was reasonably abatable by Veolia within its unilateral $100,000 expenditure authority without USIBWC approval. *Wilson v. Southern California Edison Co.*, 234 Cal.App.4th 123, 160–165 (2015) (balancing test is required element of private nuisance claim). *See also*, CACI No. 2022.

91. Wippler's personal conduct in allowing the private nuisance constitutes affirmative operational misconduct because Wippler managed the Facility's maintenance prioritization process, received the internal reports identifying equipment deficiencies, controlled Veolia's maintenance budget allocation, and made or ratified the decisions not to remediate the known deficiencies that were causing contaminants to invade Plaintiffs' properties. Wippler personally participated

in creating and maintaining the nuisance, making him directly liable to Plaintiffs under California law.

92. Wippler's individual conduct directly and proximately caused a substantial and unreasonable interference with Plaintiffs' use and enjoyment of their properties. The gravity of the harm associated with the physical contamination of Plaintiffs' homes, health impacts from pathogen exposure, and loss of use of Plaintiffs' properties and nearby beaches for over 1,000 consecutive days, substantially outweighs any social utility attributable to Wippler's maintenance deferral decisions, which served no legitimate operational purpose and were contrary to his own contractual obligations.

93. Defendant Freund affirmatively created the private nuisance interfering with Plaintiffs' use and enjoyment of their properties by directing or permitting the deferral of preventive and corrective maintenance on the canyon collectors, the Hollister Street Pump Station surge tank pressure relief valve, bar screens, and other critical Facility infrastructure within his maintenance management authority.

94. Freund's specific maintenance tasks would have allowed Freund to prevent or abate the nuisance. These include scheduling preventive maintenance on the Hollister Street surge tank pressure relief valve, directing canyon collector sediment removal, completing work orders for bar screen bearing replacements, and maintaining influent pump functionality. All of these tasks fell within Freund's CMMS work order authority and within Veolia's unilateral $100,000 expenditure

limit. No USIBWC approval, capital appropriation, or diplomatic coordination was required. Freund's personal failure to perform or direct these routine maintenance tasks was a substantial proximate cause of nuisance's continuance.

95. Defendant Schmidt affirmatively created the private nuisance that interfered with Plaintiffs' use and enjoyment of their properties by directing or permitting the operational failures that caused untreated sewage and aerosolized pathogens to bypass treatment, enter the Tijuana River Estuary, and physically contaminate the air, soil, and water of the South Bay and Plaintiffs' properties. These failures include inadequate management of bar screens, influent pumps, equalization basins, and canyon collector systems. These were not passive omissions but affirmative acts of operational mismanagement within Schmidt's direct personal authority as Operations Manager.

96. Defendants know that allowing contaminated water to spread into the air, soil, water, and enter Plaintiffs' properties would cause a significant risk of injury and illness. Defendants acted recklessly and with conscious disregard to human life and safety. This is despicable and oppressive conduct. Plaintiffs thus seek punitive damages in an amount sufficient to punish Defendants' long history of deliberate disregard for Plaintiffs' safety.

## FOURTH CAUSE OF ACTION
**Trespass**
*[Against All Defendants]*

97. Plaintiffs reallege and incorporate by reference all of the above paragraphs of this Complaint as though fully stated herein.

98. At all relevant times, Plaintiffs were the owners, tenants, and/or lawful occupiers of real properties in the area of the contamination.

99. Defendants intentionally, and in the alternative recklessly, discharged raw sewage, pollution, and contaminated water from the Facility's infrastructure—including the Hollister Street Pump Station, the canyon collectors, and the SBOO—knowing with substantial certainty that those discharges would spread contamination into the surrounding environment. The sewage, pollutants, and contaminated water spread and physically entered Plaintiffs' properties through multiple mechanisms: (a) aerosolized sea spray carrying fecal bacteria, pathogens, and toxic chemical compounds that physically deposited on and entered Plaintiffs' homes, yards, and persons; (b) contamination of the municipal water supply and Plaintiffs' plumbing systems; and (c) direct soil contamination of Plaintiffs' land from flooding and runoff events. These physical entries caused actual, tangible damage to Plaintiffs' properties. The aerosolization pathway is scientifically documented for this specific location: the February 2024 SDSU White Paper and the 2024 Rico et al. ChemRxiv preprint both measured sewage-contaminated aerosols from the Tijuana River and Pacific Ocean shoreline area—the precise location of the canyon collector bypass discharges alleged herein—at levels presenting a public health threat to communities miles away, without direct water contact. The physical deposition of fecal bacteria,

pathogens, and toxic chemical compounds onto Plaintiffs' properties from this documented aerosol pathway is not speculative; it is the subject of peer-reviewed scientific measurement. *See Staples v. Hoefke*, 189 Cal.App.3d 1397, 1407 (1987) (emission causing actual physical damage to property constitutes trespass); *Cassinos v. Union Oil Co.*, 14 Cal.App.4th 1770 (1993) (injection of offsite waste amounts to trespass).

100. Wippler intentionally, and in the alternative recklessly, caused the physical entry of raw sewage, aerosolized pathogens, toxic chemical compounds, and contaminated water onto Plaintiffs' properties by directing or permitting the operational decisions that caused untreated discharges from the Facility's infrastructure. Wippler knew with substantial certainty that sewage-contaminated aerosols and runoff from the Facility's bypass events would physically enter and contaminate Plaintiffs' homes, yards, and persons without their consent. Wippler received Investigative Order No. R9-2025-0022, which expressly confirmed that during the 91-day spill event from June 17 through September 15, 2024, all transboundary flows were within the canyon collectors' design capacity, meaning the 58.8 million gallons that bypassed treatment and entered the Tijuana River, and ultimately Plaintiffs' air and properties, bypassed treatment because of maintenance decisions Wippler made or authorized, not because the Facility was overwhelmed.

101. Schmidt substantially caused the physical entry of raw sewage, aerosolized pathogens, and toxic chemical compounds onto Plaintiffs' properties by

directing or permitting the operational failures at the SBIWTP that caused untreated discharges from the Facility's infrastructure. As Operations Manager, Schmidt oversaw the operational systems whose failure caused those discharges and knew with substantial certainty that sewage-contaminated aerosols and runoff would physically invade and contaminate Plaintiffs' homes, yards, and persons without their consent.

102. Freund, as Maintenance Manager, controlled the Facility's maintenance systems, including the surge tank pressure relief valve, canyon collectors, bar screens, and pump stations, whose failures caused the untreated discharges resulting in the physical entry of raw sewage, aerosolized pathogens, and toxic chemical compounds onto Plaintiffs' properties.

103. Plaintiffs did not grant permission for any pollution, sewage, and contaminated water to enter or to come into contact with their properties.

104. This trespass was a substantial factor in causing Plaintiffs to suffer damages including, but not limited to, damage to real property, damage to structures, damage to personal property and cherished possessions, discomfort, annoyance, inconvenience, mental anguish, loss of quiet enjoyment, and emotional distress. Plaintiffs each seek damages to be determined, on an individual basis, according to proof at trial.

105. Defendants acted recklessly and with conscious disregard to human life and safety. This is despicable and oppressive conduct. Plaintiffs thus seek punitive

damages in an amount sufficient to punish Defendants' long history of deliberate disregard for Plaintiffs' safety.

106. Wippler's trespassory conduct was reckless, wanton, and malicious within the meaning of California Civil Code Section 3294. Wippler received at least fifteen Notices of Violation, three formal enforcement orders from the San Diego Regional Water Quality Control Board, and repeated community complaints documenting the physical invasion of contaminated material onto Plaintiffs' properties, yet made no corrective use of his operational authority to stop those invasions. That willful disregard of the property rights of Plaintiffs warrants an award of punitive damages against Wippler individually.

## FIFTH CAUSE OF ACTION
**Battery**
*[Against All Defendants]*

107. Plaintiffs reallege and incorporate by reference all of the above paragraphs of this Complaint as though fully stated herein.

108. Defendants, including one or more officers, directors, and/or managers, knew that their conduct and affirmative acts in discharging pollutants, raw sewage, and toxic materials into South San Diego waters and the air would cause Plaintiffs to contact, ingest, breathe, or drink that polluted air and water. Defendants were substantially certain—not merely that harm was foreseeable, but that Plaintiffs' physical contact with discharged pollutants was virtually certain given: the SDSU

White Paper's (Feb. 2024) documentation that aerosolized pollutants reach communities without direct water contact; the hundreds of community complaints Defendants received; and at least 15 Water Board enforcement actions, each documenting this precise exposure pathway. This knowledge satisfies the substantial certainty standard for civil battery intent. Defendants' intentional unlawful conduct is also independently established: each of the at least 1,430 documented NPDES violations was an intentional decision by Veolia to operate the Facility in a manner it knew to violate federal law. Under California law, when a defendant's act is unlawful, battery intent requires only "an intent to do the [unlawful] act," not intent to harm. *Austin B. v. Escondido Union Sch. Dist.*, 149 Cal. App. 4th 860, 873 (Ct. App. 2007). Each deliberate discharge in violation of the NPDES Permit was an intentional unlawful act from which offensive contact with Plaintiffs followed with substantial certainty. To the extent Veolia argues they had mere "awareness" of harmful consequences, not intentional unlawful conduct, this cannot be reconciled with the record: Defendants repeatedly chose to operate the Facility in violation of regulatory orders and their own permit, on hundreds of documented occasions, over years. That is not inadvertent negligence; it is intentional conduct. *Ashcraft v. King*, 228 Cal.App.3d 604, 613 (1991) (intent satisfied by willful disregard of plaintiff's rights).

109. Wippler personally committed battery upon Plaintiffs by intentionally and knowingly authorizing, directing, or permitting the discharge of untreated

sewage, fecal bacteria, pathogens, and toxic chemical compounds into the air, water, and environment of Imperial Beach, with substantial certainty that those contaminants would physically contact and enter the bodies of Plaintiffs through direct inhalation of aerosolized sewage particulates, ingestion of contaminated water, and dermal exposure. Wippler committed all of these acts without Plaintiffs' express or implied consent.

110. Defendants were aware that their conduct in discharging pollutants, raw sewage, and toxic materials into South San Diego waters and the air would contact Plaintiffs in an offensive or harmful way. Defendants' affirmative conduct caused Plaintiffs to come into contact with and be exposed to harmful and deadly pathogens, including E. coli, SARS-CoV2, hepatitis A, human norovirus, and other viruses.

111. Each intentional decision by Wippler to defer maintenance at the SBIWTP—including his direction to defer servicing of the Hollister Street Pump Station surge tank pressure relief valve—was made with the knowledge that discharge events would occur, causing the physical contact of contaminants with Plaintiffs' persons.

112. Despite this, Defendants discharged pollutants, including raw sewage and toxic materials, into South San Diego waters and the air. Defendants continued this harmful and offensive conduct even after receiving at least 15 Notices of Violation from the San Diego Regional Water Quality Control Board, multiple enforcement orders including Cease and Desist Orders, a Time Schedule Order, and

an Investigative Order, all of which put Defendants on actual notice that their conduct was causing ongoing harm to Plaintiffs and others similarly situated.

113. Plaintiffs never consented to contacting, breathing, ingesting, or drinking polluted air and water, raw sewage, or dangerous pathogens.

114. Defendants' conduct was reckless, wanton, malicious, and in bad faith. In addition to compensatory or nominal damages, Defendants should also be liable for punitive damages as a result of Defendants' recklessness, wantonness, maliciousness, and bad faith.

115. Defendant Schmidt, as Operations Manager, oversaw the operational systems whose failure caused the discharges and knew with substantial certainty—by virtue of the scientific documentation, regulatory enforcement actions, and community complaints in his possession—that sewage-contaminated aerosols and runoff would physically invade and contaminate Plaintiffs' homes, yards, and persons without their consent.

116. Schmidt nevertheless caused the physical entry of raw sewage, aerosolized pathogens, and toxic chemical compounds onto Plaintiffs' properties by directing or permitting the operational failures at the SBIWTP that caused untreated discharges from the Facility's infrastructure.

117. Defendant Freund personally committed battery upon Plaintiffs by knowingly directing or permitting the maintenance failures at the SBIWTP that caused untreated sewage, fecal bacteria, pathogens, and toxic chemical compounds

to be discharged into the environment of the South Bay, with substantial certainty that those contaminants would physically contact and enter the bodies of Plaintiffs through inhalation of aerosolized sewage particulates, ingestion of contaminated water, and dermal exposure, without Plaintiffs' express or implied consent. As the individual responsible for maintaining the Facility's pollution-capture infrastructure, Freund's maintenance decisions proximately and substantially caused each such offensive physical contact.

118. Each intentional decision by Freund to defer required maintenance—including his deferral of preventive maintenance on the Hollister Street surge tank pressure relief valve, canyon collector sediment removal, bar screen bearing replacement, and pump station maintenance—was an act from which the offensive physical contact of contaminants with Plaintiffs' persons followed with substantial certainty.

119. Wippler's conduct underlying the battery claims was malicious, oppressive, and fraudulent within the meaning of California Civil Code Section 3294. Wippler continued to certify compliance reports concealing the severity of infrastructure failures, perpetuating the discharge conditions causing non-consensual physical contact with Plaintiffs, after repeated regulatory enforcement actions put him on actual notice that those conditions were causing Plaintiffs physical harm. This course of conduct was undertaken with deliberate concealment and conscious

disregard for Plaintiffs' bodily integrity and thereby warrants a punitive damages award against Wippler.

## SIXTH CAUSE OF ACTION
## Negligence Per Se — Health & Safety Code §§ 5411 and 5411.5
*[Against All Defendants]*

120. Plaintiffs reallege and incorporate by reference all of the above paragraphs of this Complaint as though fully stated herein.

121. Defendants' violation of Health and Safety Code sections 5411 and 5411.5 constitutes negligence per se, establishing both the applicable standard of care and Defendants' breach thereof, as alleged in Count One. Health and Safety Code section 5411 prohibits any person from discharging "sewage or other waste . . . in any manner which will result in contamination, pollution or a nuisance." Defendants violated this prohibition on at least 1,430 documented occasions. Section 5411.5 separately imposes strict liability "without regard to intent or negligence" upon any person who causes sewage to be discharged into state waters, providing an independent basis for liability requiring no showing of fault. The contamination, pollution, and nuisance arose directly from and as a result of Defendants' treatment and disposal of waste at the SBIWTP and through the Facility's associated infrastructure, satisfying the definition of "nuisance" under Health and Safety Code section 5410(f)(3), which requires that the nuisance "occur during, or as a result of, the treatment or disposal of wastes." The specific spill events described in ¶¶ 30–33

herein were not "authorized by law and in compliance with waste discharge requirements" within the meaning of any exception to section 5411: they were "Spill Events" as defined in the NPDES Permit—i.e., discharges arising from operational failure—that Veolia had a contractual obligation to prevent and for which the Permit expressly assigned Veolia responsibility.

122. Defendants' negligent, reckless, and/or illegal actions and inactions in discharging waste in a manner that resulted in contamination, pollution, and a nuisance was a substantial factor in causing Plaintiffs to suffer damages including, but not limited to, damage to real property, damage to structures, damage to personal property and cherished possessions, physical injuries and illness, discomfort, annoyance, inconvenience, mental anguish, loss of quiet enjoyment, loss of business profits, and emotional distress. Plaintiffs each seek damages to be determined, on an individual basis, according to proof at trial.

123. Wippler, as the individual directly responsible for the Facility's operational compliance, was himself obligated to ensure that sewage was not discharged in violation of the NPDES Permit. Wippler's personal certification of compliance reports that concealed ongoing violations, and his personal direction of maintenance deferral decisions that caused discharge events in violation of the Permit, make him personally accountable for each statutory violation.

124. Wippler caused sewage to be discharged into the Tijuana River by directing maintenance deferral decisions that caused the Hollister Street Pump

Station to fail and by failing to take available corrective action after receiving repeated regulatory enforcement notices confirming that the Facility's operational failures were resulting in such discharges.

125. Freund's individual violations of Health and Safety Code section 5411 are established by the Hollister Street Pump Station failure events he was responsible for preventing. The June 17, 2024 surge tank pressure relief valve failure was caused by Freund's personal deferral of required preventive maintenance and resulted in the discharge of approximately 302,000 gallons of sewage into the Tijuana River in a manner resulting in contamination and nuisance to Plaintiffs. The January 1, 2025 failure of the same valve was caused by Freund's further failure to replace or adequately maintain the valve after the first failure and resulted in the discharge of approximately 4.2 million additional gallons of sewage into the Tijuana River in continued violation of the statute.

126. Freund personally caused sewage to be discharged into the Tijuana River, a water of the United States, by directing maintenance deferral decisions that caused the Hollister Street Pump Station to fail on June 17, 2024 and again on January 1, 2025, and by failing to maintain the canyon collectors in operational condition, resulting in bypass discharges of untreated sewage into state waters.

127. Schmidt was obligated under Health and Safety Code sections 5411 and 5411.5 to ensure that sewage was not discharged in violation of the NPDES permit. Schmidt personally directed operational functions in a manner that repeatedly

violated effluent limitations, including sustained failures to meet limits for suspended solids, biochemical oxygen demand, fecal coliform, and enterococci since at least July 2022. Schmidt therefore personally committed violations of Health and Safety Code section 5411.

128. Between June 17 and September 15, 2024, Schmidt's operational direction of the Facility failed to prevent approximately 58.8 million gallons of wastewater from bypassing treatment and discharging into the Tijuana River in a manner resulting in contamination and nuisance to Plaintiffs. Investigative Order No. R9-2025-0022 confirmed that all transboundary flows during this period were within the canyon collectors' design capacity, establishing that the discharges resulted from operational failures within Schmidt's authority to prevent.

129. Defendants acted recklessly and with conscious disregard to human life and safety. This is despicable and oppressive conduct. Plaintiffs thus seek punitive damages in an amount sufficient to punish Defendants' long history of deliberate disregard for Plaintiffs' safety.

130. Plaintiffs' claims for economic damages, including diminution in property value and remediation costs, are grounded in the physical intrusion of aerosolized sewage, pathogens, hazardous chemicals (including DDT, PCBs, and Benzidine), and raw sewage particulates onto and into Plaintiffs' real and personal property -- a tangible, physical trespass constituting actual property damage. These claims are therefore not barred by the economic loss rule under *S. Cal. Gas Leak*

*Cases* (*Gas Leak Cases*), 441 P.3d 881 (Cal. 2019), because the economic harm flows directly from actual physical contamination of property, not from purely financial loss unaccompanied by physical injury. Plaintiffs further allege non-economic damages for personal physical injury, illness, discomfort, annoyance, and loss of quiet enjoyment, which are independently recoverable under each cause of action asserted herein. The distinction between economic and non-economic damages is addressed separately in the Prayer for Relief to ensure full recovery under applicable California law. Plaintiffs further allege that their economic losses—including diminution in property value, costs of remediating contaminated property, and lost rental and business income—flow directly and exclusively from the physical contamination of their real property by aerosolized sewage particulates, fecal bacteria, heavy metals (including lead, DDT, and PCBs), and pathogenic organisms. These are not the type of "purely economic losses" flowing from a "man-made disaster" barred by the economic loss rule under *Gas Leak Cases*, as that case addressed economic harm to plaintiffs who had no physical contact with the pollution itself. Here, Plaintiffs' properties were physically contaminated—aerosolized sewage particulates physically deposited on their homes, yards, and persons—and their economic losses are the direct financial consequence of that documented physical property damage. Economic losses caused by direct physical contamination of property are recoverable as a component of property damage, not as "purely economic losses" under *Gas Leak Cases*. *See also Cassinos v. Union Oil*

*Co.*, 14 Cal.App.4th 1770 (1993) (property owner can recover economic losses stemming from physical contamination of property).

## PRAYER FOR RELIEF

Plaintiffs seek the following damages in an amount according to proof at the time of trial:

i. General and/or special damages determined on an individual basis according to proof;

ii. Loss of the use, benefit, goodwill, and enjoyment of Plaintiffs' real and/or personal property;

iii. Loss of wages, earning capacity, goodwill, and/or business profits or proceeds and/or any related displacement expenses;

iv. Out of pocket costs;

v. Damage to real and personal property;

vi. Past and future medical expenses and incidental expenses;

vii. General damages for personal injury, emotional distress, fear, annoyance, disturbance, inconvenience, mental anguish, and loss of quiet enjoyment of property;

viii. Prejudgment interest;

ix. For punitive and exemplary damages in an amount sufficient to punish Defendants' conduct and deter similar conduct, as allowed under all applicable law; and

x. Any and all other and further such relief as the Court shall deem proper, all according to proof.

**JURY TRIAL DEMAND**

Plaintiffs respectfully request that this Court provide them with a jury trial on all causes of action for which a jury trial is available under the law.

**ADLER LAW GROUP, APLC**

Dated: October 30, 2026

By: *\/s/ Ellen Adler*
Ellen Adler (CA SBN 235534)

*Counsel to Plaintiffs*